In re GRAND JURY PROCEEDINGS, John DOE # 700.

UNITED STATES of America, Plaintiff-Appellee,

v.

(UNDER SEAL), Defendant-Appellant.

No. 87–5527.

United States Court of Appeals, Fourth Circuit.

Argued April 6, 1987.
Decided May 5, 1987.

Richard A. Hibey (Timothy M. Broas, Gordon A. Coffee, Thomas P. Steindler, Anderson, Hibey, Nauheim & Blair, on brief), for defendant-appellant.

Vincent L. Gambale, Sp. Asst. U.S. Atty. (Henry E. Hudson, U.S. Atty., Theodore S. Greenberg, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before WINTER, Chief Judge, and WIDENER and PHILLIPS, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

Ferdinand and Imelda Marcos appeal from the district court's order holding them in contempt for refusing to produce documents before a federal grand jury. The Marcos' argue that they are shielded from compulsory process by head-of-state immunity and that they are protected from providing evidence by the privilege against self-incrimination under both the Philippine and United States Constitutions. We affirm the contempt order.

I.

Ferdinand Marcos is the former President of the Republic of the Philippines, and Imelda Marcos is his wife. In early 1986, Mr. Marcos' presidency came to an end, and he was replaced by Corazon Aquino. On February 26, 1986, Mr. and Mrs. Marcos left the Philippines and flew to the United States, where they have remained ever since.

In January 1987 a federal grand jury in the Eastern District of Virginia issued subpoenas commanding the Marcos' to testify before the grand jury in February 1987 and to provide certain documents relating to the Marcos government. These subpoenas superseded broader subpoenas issued by the same grand jury in December 1986. The grand jury, which was convened before

the Marcos' arrival in the United States, is investigating possible corruption in American companies' arms contracts with the Philippines. The Marcos' moved to quash the subpoenas, invoking head-of-state immunity and the privileges against self-incrimination under both the United States and the Philippine Constitutions. Shortly thereafter, on February 3, 1987, the Aquino government issued a diplomatic note purporting to waive any residual head-of-state or diplomatic immunity enjoyed by Mr. and Mrs. Marcos.

At a closed hearing on February 11, 1987, at which the Marcos' were not present, the district court denied the motion to quash on the grounds that the Philippine government had waived the Marcos' head-of-state immunity and on the grounds that fear of foreign prosecution did not justify invocation of the United States or Philippine privilege against self-incrimination. The government then moved to confer "act of production" immunity on Mr. and Mrs. Marcos *in absentia* under 18 U.S.C. §§ 6002–6003. At that time, the government did not seek testimonial immunity. The court granted the government's motion to confer "act of production" immunity, and counsel for the Marcos' then stated that his clients would refuse to produce the documents notwithstanding the grant of immunity.* The district court held the Marcos' in contempt, ordered that they be confined, and stayed the confinement order pending this appeal.

## II.

■ We turn first to the contention that Mr. Marcos is entitled to immunity from process as a former head of state and that Mrs. Marcos is entitled to immunity as the wife of a former head of state. Head-of-state immunity is a doctrine of customary international law. Generally speaking, the doctrine maintains that a head of state is immune from the jurisdiction of a foreign state's courts, at least as to authorized

official acts taken while the ruler is in power. *See, e.g., Kilroy v. Windsor* (Prince Charles, The Prince of Wales), Civ. No. C–78–291 (N.D.Ohio 1978), *excerpted in* 1978 Dig.U.S.Prac.Int'l L. 641–43; *Chong Boon Kim v. Kim Yong Shik* (Hawaii Cir.Ct.1963), *excerpted in* 58 Am.J. Int'l L. 186–87 (1964); *Hatch v. Baez*, 7 Hun. 596 (N.Y.Sup.Ct.1876). Like the related doctrine of sovereign immunity, the rationale of head-of-state immunity is to promote comity among nations by ensuring that leaders can perform their duties without being subject to detention, arrest or embarrassment in a foreign country's legal system. *See generally* Note, *Resolving the Confusion Over Head of State Immunity; The Defined Rights of Kings*, 86 Colum.L.Rev. 169, 171–79 (1986).

The exact contours of head-of-state immunity, however, are still unsettled. The cases do not make clear, for example, whether a state can waive one of its former ruler's head-of-state immunity, as the current Philippine government has endeavored to do here. Indeed, not one of the cases cited by the Marcos' even addresses the issue. *See O'Hair v. Wojtyla*, Civ. No. 79–2463 (D.D.C.1979), *excerpted in* 1979 Dig.U.S.Prac.Int'l L. 897 (holding that suit against the Pope was prohibited by the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*); *Kilroy v. Windsor, supra* (holding Prince Charles immune in accordance with a State Department Suggestion of Immunity); *Psinakis v. Marcos*, Civ. No. C–75–1725 (N.D.Cal.1975), *excerpted in* 1975 Dig.U.S.Prac.Int'l L. 344–45 (honoring a Suggestion of Immunity for then-President Marcos); *Chong Boon Kim v. Kim Yong Shik, supra* (honoring a Suggestion of Immunity for a Korean foreign minister). The effect of the Philippine government's "waiver" therefore appears to be a question of first impression.

■ We think the waiver should be given full effect. Head-of-state immunity is

---

\* In fact, by agreement of the parties, the documents had been transmitted to the district court pending "the ultimate resolution of [the Marcos'] claims of privilege and immunities with respect to th[e] documents." The agreement was approved by the district court which then ordered the documents sealed and accessible to no one until the outcome of this litigation.

founded on the need for comity among nations and respect for the sovereignty of other nations; it should apply only when it serves those goals. In this case, application of the doctrine to Ferdinand and Imelda Marcos would clearly offend the present Philippine government, which has sought to waive the Marcos' immunity, and would therefore undermine the international comity that the immunity doctrine is designed to promote. Our view is that head-of-state immunity is primarily an attribute of state sovereignty, not an individual right. Respect for Philippine sovereignty requires us to honor the Philippine government's revocation of the head-of-state immunity of Mr. and Mrs. Marcos.

Related principles of diplomatic immunity support the conclusion that head-of-state immunity can be waived by the sovereign. The Vienna Convention on Diplomatic Relations, to which the United States is a party, provides that diplomats of the sending state generally are immune from criminal and civil process of the receiving state, that they are "not obliged to give evidence as a witness," and that their persons are "inviolable." Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95, Articles 31(1), 31(2), 29. But the Convention also provides that "[t]he immunity from jurisdiction of diplomatic agents [and their families] ... may be waived *by the sending State.*" *Id.* Art. 32(1) (emphasis added). That waiver must be "express." *Id.* Art. 32(2). Clearly, an individual enjoys diplomatic immunity only at the pleasure of that individual's state. It is true that this provision of the Vienna Convention applies only to diplomats, but we see no reason that its rationale should not also apply to heads of state. It would be anomalous indeed if a state had the power to revoke diplomatic immunity but not head-of-state immunity.

The Marcos' contend that honoring the Philippine government's waiver will establish a system that is not "civilized," since "political enemies [will be] entitled to expunge international legal protections from their adversaries once they have been removed from office—peacefully or other-

wise." This prospect does not change our view of the case. As we see it, a fundamental characteristic of state sovereignty is the right to determine which individuals may raise the flag of the ship of state and which may not. This system may indeed be somewhat "uncivilized," as the Marcos' suggest, because it may degrade ex-rulers who happen to fall out of favor with their former constituents or political successors. But the system suggested by Mr. and Mrs. Marcos would be at least as uncivilized, for it would allow disfavored ex-rulers to mock the existing government by claiming immunity in the name of that government.

Finally, the Marcos' argue that the "more appropriate approach" to this issue is that taken by the Supreme Court in *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), in which the Court held former President Nixon immune from civil liability for his official acts. The issue in this case, however, is not whether the Marcos' may be civilly liable, but whether they are wholly immune from process. Moreover, as the government points out, an ex-President may be subpoenaed "to produce relevant evidence in a criminal case," *id.* at 760, 102 S.Ct. at 2707 (Burger, C.J., concurring), and even a sitting President may not claim immunity from a criminal subpoena. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). We hardly think the *Nixon* cases support the Marcos' claim that they are entirely immune from process.

In sum, we hold that the current Philippine government has waived whatever head-of-state immunity was enjoyed by Ferdinand and Imelda Marcos. We therefore need not decide whether that immunity would have extended to unauthorized acts carried out during Mr. Marcos' term or whether it would have been limited to official authorized acts. Nor is it necessary for us to decide whether to defer to the opinion of the Deputy Legal Advisor of the State Department, expressed in a letter that is part of the record, that the Marcos' are not entitled to head-of-state immunity.

We affirm the district court's holding that the Philippine government has waived the Marcos' head-of-state immunity.

### III.

■ The next question presented is whether 28 U.S.C. § 1782(a) forbids the government to take the Marcos' grand jury testimony in violation of the Philippine privilege against self-incrimination. The question arises because the United States and the Philippines have entered into an executive agreement providing for mutual cooperation with respect to criminal investigations ongoing in both countries. By its terms, however, each government is constrained by the "law, practice and procedure" of the United States. The Marcos' contend that 28 U.S.C. § 1782(a) makes applicable to the United States the Philippine privilege against self-incrimination.

Section 1782 regulates the taking of testimony in United States courts pursuant to formal requests, known as letters rogatory, from foreign governments. It states:

§ 1782. Assistance to foreign and international tribunals and to litigants before such tribunals.

a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person....

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

The section forbids the taking of testimony in violation of any privilege, including the Philippine privilege against self-incrimination.

The Marcos' argue that § 1782 applies here because the grand jury subpoenas were "made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal...." We disagree. The subpoenas were issued as part of a grand jury investigation that began before the Marcos' arrived in the United States. Although the Philippine and United States government have entered into a Mutual Assistance Agreement, ensuring mutual cooperation in criminal investigations, there is no evidence that a Philippine "tribunal" issued "letters rogatory" or "requested" that the grand jury issue subpoenas to Mr. and Mrs. Marcos. The evidence is instead that the federal grand jury issued the subpoenas on its own initiative as part of its ongoing investigation into corruption in the dealings of American corporations with the Marcos regime. We therefore reject the argument that § 1782 applies to these grand jury subpoenas. It follows that § 1782 does not render applicable the Philippine privilege against self-incrimination.

### IV.

■ The Marcos' also argue that compelling them to produce evidence will violate their Fifth Amendment privilege against self-incrimination, because the United States government's grant of prosecutorial immunity cannot shield them from prosecution in the Philippines. They ask us to reconsider our decision in *United States v. Under Seal (Araneta)*, 794 F.2d 920, 925–28 (4 Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986), in which we held that the Fifth Amendment privilege against self-incrimination provides no protection from self-incrimination under foreign law. We decline to overturn our holding in *Araneta,* and we therefore affirm the district court's decision that enforcement of the subpoenas will not violate the Marcos' Fifth Amendment rights.

### V.

■ Finally, the government contends that this appeal controls the Marcos' obligation to testify as well as their obligation to produce documents. The government stresses that the Marcos' moved to quash the subpoena's command that they testify as well as its command that they produce documents, and that their motion was denied in its entirety. But after the motion was denied, the government sought and obtained only "act of production" immunity for the Marcos'. It did not seek testimonial immunity. At the contempt hearing the government moved to hold the Marcos' in contempt only for refusing to "provide the documents called for in the subpoena," and

the district court's order held the Marcos' in contempt only "for refusing to provide the documents to the grand jury." Neither the motion nor the order mentioned the Marcos' refusal to testify.

Only the contempt order, not the motion to quash, is appealable, *see Cobbledick v. United States*, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed.2d 783 (1940), and accordingly only the issues raised in the contempt order are before us. Therefore the only issue we decide is the validity of the order finding the Marcos' in contempt for failing to produce the documents. We express no view with regard to any refusal on the part of the Marcos' to testify before the grand jury should they be given testimonial immunity.

## VI.

To summarize, we hold that the Marcos' are not entitled to head-of-state immunity from process to produce documents and that they are not shielded from providing such documents by the privilege against self-incrimination of either the Philippine or United States Constitutions.

AFFIRMED.